IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 7, 2011 Session

IN RE TYLON L. D.

Appeal from the Chancery Court for Hawkins County
No. A-306      Thomas R. Frierson, II, Chancellor

No. E2010-01744-COA-R3-PT - FILED - MAY 18, 2011

This is a termination of parental rights case pertaining to Tylon L.D. ("the Child"), the minor child of Pamela D. ("Mother").  Eighteen months after the Child was placed in her care,  the Child's prospective adoptive parent, Carman E. ("Foster Mother"), filed a complaint seeking to terminate Mother's parental rights and asking to adopt the Child.  After a trial before Chancellor Thomas R. Frierson, II ("the trial court"), the court terminated Mother's rights upon finding, by clear and convincing evidence, that multiple grounds existed for terminating her parental rights  and that termination was in the Child's best interest.[1]  Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Beth Boniface, Morristown, Tennessee, for the appellant, Pamela D.

Daniel G. Boyd, Rogersville, Tennessee, for the appellee, Carman E.

**OPINION**

---

I.

The Child was born to Mother and Father, an unmarried couple, on August 17, 2004. The genesis of this case goes back to October 14, 2005, when police were called to a house where Mother was staying with the Child. A search revealed drugs, drug paraphernalia and a gun concealed inside the Child's clothing. Mother was arrested and charged with multiple offenses including possession of cocaine, a firearm in the commission of a felony, and drug paraphernalia. In addition, she was charged with child endangerment. As a result of these charges, she was taken to jail. On the same day, the Department of Children's Services ("DCS") placed the Child in foster care with Foster Mother; the Child was living with Foster Mother when this case was tried below some four years plus later.

In November 2005, DCS formulated the initial permanency plan; it identified Mother's responsibilities toward the stated goal of reunifying her and the Child. Generally summarized, it provided that Mother needed to establish safe, stable housing; resolve her legal issues; obtain employment to become "legally financially stable;" obtain transportation; complete a mental health intake, an alcohol and drug assessment, and a parenting assessment and follow all related recommendations; and submit to random drug screens. Mother signed the plan, indicating that she participated in its creation; that it was reviewed with her; and that she agreed with its provisions. The criteria for terminating parental rights was also explained to Mother and she was provided a copy of the criteria.

Following a February 2006 hearing in juvenile court, that court found, consistent with Mother's stipulation, that the Child was dependent and neglected. It awarded temporary custody to DCS. The court also ratified the initial permanency plan. Mother remained in jail for six months prior to being released on bond on March 1, 2006. Pursuant to her guilty pleas, she was ultimately convicted of possessing cocaine and drug paraphernalia; the remaining charges were dismissed. She was sentenced to 11 months and 29 days on probation. She was also ordered to pay certain fines and court costs. She was released with credit for time served.

In October 2006, a hearing was held in juvenile court on a revised permanency plan. At this point, the Child had been in foster care for a year. Mother did not attend the hearing but was represented there by counsel. Mother objected to one of the plan's dual goals, *i.e.*, adoption. The other goal of the plan was reunification. At the conclusion of the hearing, the court ordered that the Child would remain in DCS custody. In declining to approve the revised plan, the juvenile court stated, in relevant part, as follows:

> The court finds that [DCS] has used reasonable efforts to attempt to return the [C]hild to the [M]other, but the [M]other

-2-

continues to test positive for drugs. She tested positive July 26, 2006 and September 27, 2006 for cocaine. A report from Solutions indicates that . . . [M]other is not making progress. She alleges she is working at Wendy's, but she has not maintained stable employment. The [C]hild is upset by visits. This permanency plan is for three months only. The Court finds that the [C]hild is very young and three months is a long time for this [C]hild to wait. The [M]other has had a year. The court finds reasonable efforts, but will not approve the permanency plan. [DCS] is to begin the process of termination of parental rights . . . .

In April 2007, Foster Mother filed her complaint in the trial court. In furtherance of her complaint, she moved the court to terminate Mother's parental rights and requested that she be designated the Child's guardian. The court granted the latter motion and entered an order of guardianship effective as of the date of its entry.

Trial on the complaint to terminate Mother's rights was held on March 15, 2010. At the time of trial, the Child was nearly six and had been in Foster Mother's care for more than four of those years. Mother had not seen the Child since Foster Mother filed her complaint some three years earlier. In addition to the testimony of Mother, the trial court heard testimony from Mother's case manager, Toni Jenkins; Patty Cline of Solutions, an entity that provided therapeutic visitation and parenting education services to Mother; the guardian ad litem; Foster Mother; and Mother's pastor. At the conclusion of the hearing, the trial court terminated Mother's parental rights upon finding that four of the five grounds[2] alleged in support of termination were sufficiently proven, *i.e.*, that Mother abandoned the Child by her failure to support, visit, and provide a suitable home for, the Child, and that Mother failed to comply substantially with the terms of the permanency plan. The trial court further found that termination was in the best interest of the Child. Mother filed a timely notice of appeal.

---

[2]The complaint also alleged "abandonment by incarcerated person" pursuant to Tenn. Code Ann. §36-1-102(1)(A)(iv). The trial court found that this ground was not proven because Mother was not incarcerated for any part of the relevant four month period immediately preceding the filing of the complaint in this case. This issue is not before us.

## II.

Mother raises the following issues for our review:

1. Did the trial court err in finding that Mother abandoned the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1), as follows:

A. Did the trial court err in finding that Mother willfully failed to maintain contact with the Child during the relevant four-month period?

B. Did the trial court err in finding that Mother willfully failed to support the Child during the relevant four-month period?

C. Did the trial court err in finding that Mother abandoned the Child by failing to rectify the situations that resulted in the Child's removal for dependency and neglect?

2. Did the trial court err in finding that Mother failed to comply substantially with the terms of the permanency plan?

3. Did DCS employ reasonable efforts to assist Mother in achieving her goals in the permanency plan?

4. Did the trial court err in finding that termination of Mother's rights was in the best interest of the Child?

5. Did the trial court err in denying Mother's motion for visitation during the pendency of the termination case?

## III.

Under Supreme Court precedent, a court is charged in a termination of parental rights case with

> . . . determin[ing] whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). In weighing the evidence, great deference is given to the trial court's determinations of witness credibility, which findings will not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of the parent's children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Tenn. Code Ann. § 36-1-113(c)(Supp. 2007); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

As a general rule, decisions regarding custody and visitation are within the broad discretion of the trial judge and will not ordinarily be reversed absent some abuse of that discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988). Accordingly, a trial court's discretion will be upheld so long as reasonable minds can agree as to the propriety of that decision. A trial court abuses its discretion when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)(quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

IV.

In the present case, the trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and (2) (2010). These statutory provisions provide as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan. . . .

As relevant to the present case, Tenn. Code Ann. § 36-1-102 (2010), referenced in subsection (g)(1) above, contains definitions of abandonment as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
>
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was

-6-

placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

For purposes of subsection (1)(A)(i) of Section 36-1-102, " 'token support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means" and " 'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child. . . ." Tenn. Code Ann. § 36-1-102(1)(B) and (C). Additionally, " 'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation," and " 'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D) and (E). In the present case, the relevant four-month period for establishing abandonment by failure to support or visit is from December 23, 2006 to April 23, 2007, the date Foster Mother's complaint was filed.[3]

_____

[3]We observe that in her brief, Mother incorrectly calculates the 4-month period as being from January 23, 2007 to April 23, 2007, a period of only three months.

V.

A.

Mother challenges the trial court's findings that she abandoned the Child by failing to visit him, support him, or establish a suitable home for him. She essentially asserts that any deficiency charged to her was not willful. In this section, we address each of Mother's issues regarding the ground of abandonment. As this Court has noted, however, the subsections defining abandonment in Section 36-1-102 (1)(A) are construed independently of each other. "Thus, any one of them may separately form the basis for abandonment under Tenn. Code Ann. § 36-1-113(g)(1)." *In re C.S.*, No. E2008-02157-COA-R3-PT, 2009 WL 1228266 at * 5 (Tenn. Ct. App. E.S, filed May 6, 2009).

B.

The trial court found that Mother abandoned the Child by willfully failing to visit. The court stated, in relevant part:

> The evidence is clear and convincing that . . . [Mother] willfully failed to visit or engage in more than token visitation with the [C]hild. During the period of December 23, 2006 through April 23, 2007, [Mother] exercised only four visits with the [C]hild. [Mother] asserts that her failure to visit more often was due to her inability to secure proper transportation from Morristown to Rogersville, Tennessee.[4] Although round trip transportation through ETHRA[5] had been arranged for [Mother] at an approximate cost of $18.00, she chose not to utilize this arrangement. She instead incurred an expense exceeding this amount for the purpose of feeding her pet dog.
>
> [Mother] argues that her efforts to visit the [C]hild were substantially hampered by her lack of access to transportation, [relying of the case of ] In re: A.D.A., 84 S.W.3d 592 (2002). The court in A.D.A. concluded, *inter alia*, that the biological mother had not willfully abandoned the child by her failure to visit. The evidence in that case established that the mother did

[4]We observe that the distance between Morristown and Rogersville is approximately 28 miles.

[5]East Tennessee Human Resource Agency.

not own a vehicle, the child was placed in foster case at a distance of more than a two hours' drive from the home of mother and that she spent one month during the applicable four month period in a voluntary drug rehabilitation in-patient program. This Court concludes that the decision in <u>A.D.A</u>. . . . is factually distinguishable from the case at bar and not controlling.

. . . . This Court determines that by reason of [Mother's] willful failure to visit the minor [C]hild for the four months immediately preceding the filing of the petition, she has abandoned the [C]hild for purposes of termination of her parental rights.

(Underlining in original; footnotes added.)

The evidence does not preponderate against these findings by the trial court. Typically, Mother's visits were scheduled weekly. Mother initially visited the Child consistently, three to four times a month. Beginning in July 2006, however, her attendance became increasingly sporadic. While Mother blames her failure to visit entirely on a lack of reliable transportation, the record reflects that many of her missed visits were attributable to other reasons or no reason at all. Her case manager testified that Mother was a "no-show" on August 4, 2006, after having failed a drug screen at her visit the week prior; a week later she simply advised that she was "unable" to attend the visit. Her scheduled visit in mid-September was cancelled because Mother was serving a ten-day sentence for violating her probation. After appearing for her visits in October, she cancelled the next two and did not call to schedule any others in the month of November.

Turning to the critical four month period, Mother had no visits in December. In her monthly report, Ms. Cline summarized Mother's visitations:

[Mother] visited with [the Child] once and missed three scheduled visitations. [Mother] and I talked about the inconsistencies with visitations. [Mother] told me that she would do better now that she has a car, but so far she has not.

In January 2007, she visited the Child three times, but the following month visited only once and failed to show for the next scheduled visit. Her case manager, Toni Jenkins, was unable to locate Mother to schedule more visits. Once Mother was reached, she failed to appear at the next visit. At this point, Ms. Jenkins, noted that "Mother's sporadic attendance is

disruptive to the Child." Mother cancelled two visits set for March and April, citing a car problem and lack of transportation, respectively, and had no further visits.

The record further reflects that in October 2006, after the trial court ordered that visits take place at DCS's offices, Ms. Jenkins arranged a van to transport Mother through the ETHRA service at a round trip cost of $18. At trial, Mother offered no reason for not utilizing the ETHRA service. In her brief, she asserts that she "could not afford the basics in life much less ETHRA transportation." In her testimony, however, Mother admitted to taking on the cost of caring for a large dog during the same time that she experienced transportation issues. At trial, Mother was questioned as follows:

> [Counsel]: Okay. ETHRA, the . . . van that Ms. Jenkins had set up for you was eighteen dollars round trip, correct?
>
> [Mother]: Yeah.
>
> Q: Okay. Instead, you spent twenty to thirty dollars a month on your dog. What's more important, your dog or your son?
>
> A: My son.
>
> Q: Okay. So you could have saved that twenty to thirty dollars a month to spend on transportation, am I correct?
>
> A: That was, that other dog that Ms. Jenkins referred to was what, three years ago.
>
> Q: Still during the time that Ms. Jenkins was with you, correct?
>
> A: Yes.
>
> Q: Still during the time that you were complaining of transportation problems, am I correct?
>
> A: Yes.
>
> Q: And that's money that could have gone towards ETHRA, for the van, correct?
>
> A: Yes.

Q: And . . . that was money that you willfully spent for the dog instead of your son, correct?

A: Yes.

In all, Mother attended half of her scheduled visits with the Child, but only visited the Child four times in the four months before the complaint was filed. None of those visits came in the latter two months. In the same general time period, Mother's drug use apparently continued. In all, Mother failed six drug screens before Foster Mother pursued adoption; three of those came between early December 2006 and late February 2007. In December she tested positive for cocaine use, and in January and February, the screens were deemed "positive" under DCS policy because Mother provided insufficient urine samples. The evidence does not preponderate against the trial court's finding that "[Mother] willfully failed to visit or engage in more than token visitation" with the Child, and its implicit finding that, at times, Mother chose to spend her limited financial resources on other things instead of utilizing the transportation made available to her.

The evidence does not preponderate against the trial court's reliance on Mother's willful failure to visit the Child as one of the bases for the court's decision to terminate Mother's parental rights.

C.

Next, the trial court found that Mother abandoned the Child by willfully failing to provide child support:

> The evidence is clear and convincing that during the four month period preceding the filing of the instant petition, [Mother] willfully failed to support or make reasonable payments toward the support of [the Child]. During this time, [Mother] was gainfully employed and earning income. [Mother] asserts that the Permanency Plan did not direct her to pay child support. Tennessee courts have recognized that "the support of one's children should not be conditioned upon whether one has been placed under a court order to do so," D.C.S. v. T.K., 2002 LEXIS 384 (Tenn. App. 2002); State v. Manier, 1997 LEXIS 744 (Tenn. App. 1997). This Court accordingly determines that by reason of [Mother's] willful failure to pay or provide child support for the minor [C]hild during the relevant time period,

-11-

she has abandoned the minor [C]hild for purposes of termination of her parental rights.

(Underlining in original.)

"A parent's failure to make payments toward the support of their child is 'willful' when he or she 'is aware of his or her duty to support, has the capacity to support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.'" *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Mother concedes that she paid no child support during the critical four month period. She briefly notes that she "was not court[-]ordered to provide support on the ratified permanency plan." To the extent that Mother suggests she was unaware of her duty to support, we reject her argument. First, she evidences an awareness of such a duty on some level when she repeatedly emphasizes that she appeared only once for visitation without a diaper bag and food for the Child. More importantly, in this state, "biological parents are expected under the common law to understand, even in the absence of a court order, that they have an obligation under the law to support their children if they have the ability to do so." *Smith v. Gore*, 728 S.W.2d 738, 752 (Tenn. Ct. App. 1987). Mother's real argument is that she did not willfully fail to support the Child, but was "clearly unable to do so" for lack of income. She concludes that her failure to support the Child cannot constitute abandonment.

It is clear in the record that Mother was employed during the relevant four months. Mother acknowledged her employment in her testimony:

> [Counsel]: . . . [R]ight now I am talking about in 2007, she filed this [petition] in April. So let's work  from January to April. During that period of time, did you have housing?
>
> [Mother]: No, I did not.  Not a stable home for [the Child], no, I did not.
>
> Q: Okay.  And you were trying?
>
> A: Yes.
>
> Q: Okay.  You completed your, the other requirement was the drug and alcohol assessment and follow all recommendations?
>
> A: Yes.

Q: And you completed that?

A: Yes.

Q: Okay. You were getting to the visits as many as you could?

A: Yes.

Q: *And you were employed?*

A. *Yes.*

(Emphasis added).

There are also indirect references to Mother's employment. In a January 2007 report, Ms. Cline noted that Mother had dozed off during a visit. In her deposition, Ms. Cline elaborated: "[Mother] showed up, I believe she had just gotten off work." Ms. Cline later added, "I believe at that point she did have a job at McDonald's, or at a fast food restaurant." Similarly, in summarizing a February 2007 visit, Ms. Jenkins testified that Mother remarked on leaving that "she had to go to work." Other parts of the record corroborate Mother's testimony that since her release from jail, she was able to find minimum-wage jobs, at which she was employed for weeks at a time.

Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's determination that there is clear and convincing evidence of Mother's willful failure to support the Child.

D.

The trial court also found that Mother abandoned the Child by willfully failing to provide him with a suitable home in the four months immediately following his removal from her custody. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii). The court stated, in relevant part:

> . . . The Juvenile Court . . . found in approximately February 2006 that probable cause existed to believe [the Child] was dependent and neglected. The [C]hild was placed in the custody of [DCS]. For the period of four months following the removal, [DCS] made reasonable efforts to assist [Mother] in establishing a suitable home for the [C]hild. Notwithstanding such efforts,

-13-

[Mother] failed to make reasonable efforts to provide a suitable home. Further, [Mother] at that time demonstrated a lack of concern for the [C]hild to such a degree that it appeared unlikely that she would be able to provide a suitable home for the [C]hild at an early date.

Mother responds that DCS failed to exercise reasonable efforts to assist her in resolving the problems that led to the Child's removal. She urges that despite the lack of assistance, she was eventually able to resolve those problems and establish stable, suitable housing. Our review of the record persuades us that the evidence does not preponderate against the trial court's finding that DCS made reasonable efforts to assist Mother in finding suitable housing for the Child. Furthermore, the evidence does not preponderate against the trial court's further finding that Mother failed to provide the Child with suitable housing.

VI.

As a final ground for termination, the trial court found that Mother failed to comply substantially with the terms of the November 2005 permanency plan. Mother argues to the contrary and contends that DCS failed to exert reasonable efforts to assist her in completing the tasks needed for reunification.

After setting out pertinent parts of the plan, the trial court concluded, without further elucidation, that "[Foster Mother] has shown by clear and convincing evidence [Mother's] substantial noncompliance with the Permanency Plan approved by the Hawkins County Juvenile Court. As such, [Mother's] parental rights . . . are terminated by reason of this statutory basis as well."

In summary, the plan set forth the following actions for Mother to accomplish toward reunification:

> 1. Work cooperatively with her legal counsel and keep DCS informed of her progress in this area.
> 2. Establish a safe, stable residence which will meet all of her need and the needs of [the Child].
> 3. Keep DCS informed of any and all changes in her residence.
> 4. Become legally financially stable.
> 5. Receive a mental health intake (reported previous depression) and follow all recommendations.
> 6. Receive an alcohol and drug assessment to address past drug usage and . . . follow all recommendations.

7. Submit to random drug screenings.
8. Cooperate in the completion of a parenting assessment and follow all recommendations.

In addition, Mother was to cooperate with supervised visitations, including arranging her own transportation to and from visits.

At first, Mother made progress in meeting her obligations. In the first four months after her release from jail, Mother contacted DCS and continued her scheduled visits at DCS's office.[6] She visited the Child almost weekly over the next several months. In addition, Mother worked for a temporary employment services agency through May 2006. Mother rented a three-bedroom mobile home that DCS deemed suitable for the Child in July. She completed the required alcohol and drug assessment, a drug rehabilitation program, and a parenting assessment, and passed all her drug screens. Transportation remained a problem, however, and Mother's employment was never stable.

Beginning in July 2006, with some four months remaining to complete the plan, Mother's progress declined. Despite completing eight weeks of intensive drug rehabilitation, Mother tested positive for cocaine in mid-July and again in September. Mother points to hair follicle tests she took to refute the drug screens administered by DCS, but admitted that she tested positive for cocaine use two more times even after the first hair follicle test. The second test was not administered until August 2008, well after the termination/adoption proceedings were initiated, and nearly three years after the plan was developed. Further, Mother did not "resolve her legal issues" – she was jailed for violating her probation in August 2006 after she failed to report to her probation officer, failed to pay court costs, and failed a DCS drug screen. She was again charged with a probation violation in 2009. At trial, Mother admitted she was also on probation in another county and still had outstanding costs and fines related to past convictions incurred many years earlier.

Other parts of the record demonstrate that after losing her trailer, Mother did not again obtain stable housing or employment until a year to two years after the complaint was filed. Mother's testimony that she had stable housing in 2008 was uncorroborated. The record reflects only that at the time of trial, she had paid rent and maintained the same home for over a year. Mother's financial situation remained questionable. At some point in 2008, Mother began working at Taco Bell. After she sustained an on-the-job injury in September, she began receiving social security disability and worker's compensation benefits. At the time of trial in March 2010, Mother was recovering from a related shoulder surgery and had not yet returned to work. In her brief, she essentially concedes that her new-found financial

---

[6]According to her case manager, Mother had visits with the Child while she was incarcerated.

stability is mostly attributable to her unfortunate accident at work when she states: "Mother eventually got on her feet financially once she became qualified for disability and worker's compensation income." Lastly, we have previously alluded to Mother's failure to maintain consistent visitation with the Child as called for in the plan, despite DCS's efforts and assistance in this area.

In short, the November 2005 plan gave Mother one year to carry out her assigned tasks. During that time, Mother initially made progress, but then regressed. When the complaint was filed six months after the plan's rehabilitation period "expired," Mother still had not carried out most of the necessary steps to regain custody. In fact, many of the positive actions she cites in her favor were not taken until two or three years later. The evidence does not preponderate against the trial court's finding that there is clear and convincing evidence of Mother's substantial noncompliance with the permanency plan.

Termination proceedings based upon the ground of non-compliance with a permanency plan under Tenn. Code Ann. § 36-1-113(g)(2) "require DCS to demonstrate that it has made reasonable efforts to reunify the family." *See In re C.A.H.*, No. M2008-00005-COA-R3-PT, 2008 WL 3068430, at *10 (Tenn. Ct. App. M.S., filed Aug. 1, 2008)(citing *In re A. R*., No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *9 (Tenn. Ct. App. M.S., filed Dec. 13, 2007)). We next consider Mother's assertion that DCS did not use reasonable efforts to assist her in fulfilling the plan's requirements in the present case.

This Court has acknowledged that "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H*., 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004). Accordingly, "[b]efore a trial court can terminate parental rights on certain grounds, DCS has the additional burden of proving by clear and convincing evidence that it exercised 'reasonable efforts' to make it possible for the child to return home" and that those efforts were to no avail. Tenn. Code Ann. § 37-1-166(a)(2); *In re R.L.F.*, 278 S.W.3d 305, 315-16 (Tenn. Ct. App. 2008). "Reasonable efforts" is statutorily defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "[DCS] employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal…." *In re R.L.F.*, 278 S.W.3d at 316. "The duty to exert reasonable efforts exists whether the parent asks for assistance or not." *Id.* The efforts made need not be "Herculean." *In re Giorgianna H*., 205 S.W.3d at 518 )(citing *In Re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326 (Tenn. Ct. App. March 9, 2004)). However, DCS must do more than simply provide parents with a list of services. *Id*.

To determine whether reasonable efforts have been made, the trial court should consider:

> 1. The reasons for separating the parents from their children,
> 2. The parents' physical and mental abilities,
> 3. The resources available to the parents,
> 4. The parents' efforts to remedy the conditions that required removal of the children,
> 5. The resources available to the Department,
> 6. The duration and extent of the parents' efforts to address the problems that caused the children's removal, and
> 7. The closeness of the fit between the conditions that led to the removal of the children, the requirements of the permanency plan, and [DCS'] efforts.

*Id.* In this case, Mother makes no assertion that the requirements of the plan were not reasonably related to reunification. Thus, we focus on the efforts of DCS to assist Mother with the plan.

The Child was removed as a direct result of Mother's arrest on drug and weapon charges, for which she was immediately incarcerated. Mother admitted to using drugs before her arrest. The home where Mother and the Child were living at the time did not belong to Mother. Upon her release six months later, Mother was faced with pending criminal charges and had no job and no apparent place to live. Under these circumstances, the requirements of resolving her "legal issues,"(including drug use), securing suitable housing, and becoming "legally financially stable," i.e., earning an income, were certainly priorities.

DCS arranged for Mother's drug and alcohol assessment and referred her for intensive drug rehabilitation, which Mother completed. DCS monitored Mother's progress through random drug screens. When Mother regressed, her case manager urged her to return to the rehabilitation provider for further services; although Mother reported making an appointment, Ms. Jenkins was unable to confirm that Mother had followed through on this matter. DCS supervised visitations and contracted with Solutions to provide a parenting assessment, therapeutic visitation and parenting skills education Mother; arranged transportation for visitation through ETHRA (which Mother chose not to use); attended court hearings and monitored the status of Mother's criminal cases; and repeatedly reviewed with Mother the requirements of the permanency plan and advised her regarding completion of necessary actions.

The evidence does not preponderate against the trial court's finding that DCS has met its "burden of proving by clear and convincing evidence that it exercised 'reasonable efforts' to make it possible for the child to return home." Tenn. Code Ann. § 37-1-166(a)(2).

## VII.

As her final issues, Mother argues that, contrary to the trial court's judgment, it was not clearly and convincingly shown that termination of her rights was in the Child's best interest. In challenging the trial court's best interest determination, Mother essentially asserts that the majority of the statutory factors[7] weigh in her favor.

---

[7]Tenn. Code Ann. § 36-1-113(i) provides a non-exclusive list of applicable factors as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether

(continued...)

Mother also argues that it was error for the trial court to deny her visitation with the Child while the termination case was pending. The gist of Mother's position is that the resulting lack of contact with the Child affected the best interest analysis to her detriment.

The trial court set forth its best interest analysis and conclusion as follows:

> Termination of [Mother's] parental rights to the minor [C]hild is in the best interest of the minor [C]hild. The following evidence supporting this finding cumulatively constitutes clear and convincing evidence of grounds and determination of the [C]hild's best interest:
>
> . . . Mother did not make such an adjustment of circumstances or conditions as to make it safe and in the [C]hild's best interest to reside in her home. A present, meaningful relationship between Mother and the minor [C]hild has not been shown.
>
> . . . Mother did not maintain regular visitation or contact with the [C]hild, did not provide support for the benefit of the [C]hild and has not maintained a meaningful relationship with the [C]hild since the [C]hild's removal.
>
> A change of caretakers and physical home environment of the minor [C]hild is likely to have an adverse effect on the [C]hild's emotional well being. A strong bond exists between the minor [C]hild and [Foster Mother] and the physical environment of [Foster Mother's] home appears to be healthy and safe.

---

[7](...continued)
> there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

(Bracketing added.)

By the time of trial, Mother was again making progress – she had maintained stable housing, and, at least by her own, uncorroborated account, had begun paying child support, ended her drug use, attended parenting classes, and acquired transportation. As we have discussed, however, these positive steps came years after termination was pursued. All the while, the Child remained in Foster Mother's care for nearly five years and Mother had never developed a meaningful relationship with him. At trial, Mother stipulated that the Child and Foster Mother "are bonded as mother and son," and that the Child was well-cared for, healthy, and had all his needs met by Foster Mother.

Considering the relevant factors and the record as a whole, we conclude that the evidence does not preponderate against the trial court's best interest determination. In particular, it was not at all clear that Mother had made "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest" to be placed in her home.

Finally, we reject Mother's argument that the trial court erred in declining to permit visitation while the termination case was pending. As we noted earlier, at the time Foster Mother filed her complaint for termination and adoption in April 2007, an order naming her the Child's guardian was also entered. At trial, Mother testified that from then on, Foster Mother prohibited visits with the Child and no longer accepted Mother's phone calls. In August 2007, Mother moved for court-ordered visitation. Following an October 2007 hearing[8], with all parties and the guardian ad litem present, the court denied Mother's motion based upon its determination that "a pending Petition for Adoption suspends all proceedings, and, therefore, no visitation is appropriate at this time."

As we discussed earlier, Mother's track record with visitation had been steadily declining in the months leading up to the complaint. In rejecting a revised permanency plan, the juvenile court observed that the Child was "upset" with the visits and ordered DCS to initiate termination proceedings. Reports of earlier visits gave little indication of any bond or meaningful relationship with Mother. With these considerations in mind, we cannot say that the trial court abused its wide discretion concerning visitation matters and we are not inclined to disturb its ruling.

---

[8]The hearing transcript is not before us.

## VIII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Pamela D. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.


_____
CHARLES D. SUSANO, JR., JUDGE